**No. 22-55524**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FLIGHTBLITZ, INC., a California Corporation; DAVID KAYE, an individual, formerly doing business as FLIGHTBLITZ;

*Plaintiffs-Appellants*,

v.

TZELL TRAVEL, LLC, a New York limited liability company; TZELL HOLDINGS, LLC, a Delaware limited liability company; TRAVEL LEADERS GROUP, LLC, a Delaware limited liability company; TZELL TRAVEL GROUP, LLC, a business entity of unknown form

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-02116
Hon. Consuelo B. Marshall

### APPELLANTS' OPENING BRIEF

Levi Lesches — Cal. SBN 305173
**LESCHES LAW**
5757 Wilshire Boulevard, Ste 535
Los Angeles, CA 90036
Phone: (323) 900-0580
E-mail: levi@lescheslaw.com
*Attorneys for Appellants*
*FlightBlitz, Inc.; David Kaye f/d/b/a*
*FlightBlitz*

## CORPORATE DISCLOSURE STATEMENT

Appellant FlightBlitz, Inc. is a California corporation 100% owned by

Appellant David Kaye.

Date: December 12, 2022        **LESCHES LAW**


         /s/ Levi Lesches
*Attorneys for Appellants*
*FlightBlitz, Inc.; and*
*David Kaye f/d/b/a FlightBlitz*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................2

TABLE OF AUTHORITIES ...............................................................................5

ISSUES PRESENTED.......................................................................................13

STATEMENT OF THE CASE.............................................................................15

    **A.**    Summary of the SAC's Allegations Regarding Commission Pricing in the "Hosted" Travel Agent Market ....................................................15

    **B.**    Appellants' Allegations Regarding Odaka and ASTG's Initial Contract ....................................................................................19

    **C.**    Allegations Regarding Tzell and ASTG's Agreement to Fix Pricing on ASTG's Contract with FlightBlitz ....................................................24

    **D.**    *Iqbal* Sufficient Allegations Regarding the Conspirators "Independent Centers of Decisionmaking" ...............................................................25

    **E.**    Procedural History and Parties..........................................................28

SUMMARY OF THE ARGUMENT ....................................................................32

    **A.**    Summary of Appellants' Appeal of the District Court's Order Dismissing the SAC for Failure to State a Claim Under the Sherman Act or Cartwright Act.....................................................................32

    **B.**    Summary of Appellants' Appeal of the District Court's Order Declining to Grant Leave for Appellants to File Different Claims ....35

ARGUMENT .....................................................................................................37

II. THE SINGLE ENTITY RULE DID NOT BAR FLIGHTBLITZ's CLAIMS, BECAUSE THE ALLEGED CONSPIRACY OCCURRED BETWEEN INDEPENDENT CENTERS OF DECISIONMAKING .............................38

    **A.**    The Single Entity Rule Has No Application to Entities that have *Bargained* to Preserve Ongoing Competition Between them.............38

**B.** The District Court Misread *Freeman* and Further Misconstrued the SAC ......................................................................................... 41

**C.** *American Needle* is Squarely On-Point and Mandates Reversal ........ 44

**D.** The Eleventh Circuit Has Recently Endorsed FlightBlitz's Reading of *American Needle* ........................................................................... 45

**E.** *American Needle* Has Overruled Prior Opinions Clearly Irreconcilable with its Mode of Reasoning ............................................................ 49

**F.** *American Needle* and *Arrington* Requires Reversing the Dismissal of FllightBlitz's Cartwright Act Cause of Action ................................... 51

**G.** *American Needle* Was Properly Asserted in the Lower Court .......... 52

**H.** The District Court's Bright-Line Rule is Inconsistent with the Federal Trade Commission's Ongoing Efforts to Identify a "Governance" Test that can Narrow Hart-Scott-Rodino Reporting Obligations .............. 53

**III.** *MONSANTO* HAS NO APPLICABILITY TO PRICING-FREEDOM CONTRACTS .................................................................................... 56

**IV.** APPELLANTS WERE ENTITLED TO FILE A THIRD AMENDED COMPLAINT AFTER THE SAC HAD BEEN DISMISSED ................... 61

**A.** FlightBlitz Never Sought an Advisory Opinion................................. 61

**B.** FlightBlitz's Motion was Precipitated by *Kale* and *Shaver* ............... 62

**C.** The Parties were Antagonistic Regarding Legal Rights .................... 64

**D.** FlightBlitz was Entitled to Disclaim Diversity Jurisdiction over the Proposed TAC .................................................................................. 65

**E.** Because the Action Had Not Terminated, FlightBlitz was Entitled to Move for Leave to Amend Under Rule 15(a) ..................................... 66

CONCLUSION ........................................................................................ 67

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Woodford*,
    2006 WL 1748587 (E.D. Cal. June 26, 2006) ..................................................... 61

*American Needle, Inc. v. National Football League*,
    560 U.S. 183, 130 S. Ct. 2201 (2010)...........................................*Passim*

*Arizona v. Maricopa Cnty. Med. Soc*.,
    457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982)....................................... 43

*Arrington v. Burger King Worldwide, Inc*.,
    47 F.4th 1247 (11th Cir. 2022) ...................................................*Passim*

*Arrington v. Burger King Worldwide, Inc*.,
    448 F. Supp. 3d 1322 (S.D. Fla. 2020) ..................................................... 49, 50, 51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 3, 14

*Beneficial Nat. Bank v. Anderson*,
    539 U.S. 1 (2003) ................................................................................................ 65

*Bostick v. Gen. Motors, LLC*,
    2020 WL 13283478 (C.D. Cal. July 22) ............................................................. 65

*Caterpillar Inc. v. Williams*,
    482 U.S. 386, 107 S. Ct. 2425 (1987)................................................................. 65

*Chavez v. Whirlpool Corp*.,
    93 Cal. App. 4th 363 (2001) ............................................................................... 52

*Connectu LLC v. Zuckerberg*,
    522 F.3d 82 (1st Cir. 2008) ................................................................................ 36

*Copperweld Corp. v. Indep. Tube Corp*.,
    467 U.S. 752, 104 S. Ct. 2731 (1984)................................................. 3, 13, 32, 33

*Ctr. for Biological Diversity v. United States Forest Serv.*,
  925 F.3d 1041 (9th Cir. 2019) .......................................................... 36, 64

*Czeremcha v. International Association of Machinists and Aerospace Workers*,
  724 F.2d 1552 (11th Cir.1984) ....................................................... 37, 66

*Darush v. Revision LP*,
  2013 WL 8182502 (C.D. Cal. July 16, 2013) ....................................... 52

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ....................................................*Passim*

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir.1988) .............................................................. 43

*In re iBasis, Inc. Derivative Litig.*,
  551 F. Supp. 2d 122 (D. Mass. 2008) ................................................. 36

*In re Schwarzkopf*,
  626 F.3d 1032 (9th Cir. 2010) ............................................................. 52

*Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*,
  407 F.3d 1027 (9th Cir. 2005) ....................................................... 33, 51

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  201 L. Ed. 2d 924, 138 S. Ct. 2448 (2018) ......................................... 36

*Jeff D. v. Kempthorne*,
  365 F.3d 844 (9th Cir. 2004) ............................................................... 12

*Kale v. Combined Ins. Co. of Am.*,
  924 F.2d 1161 (1st Cir. 1991) ..................................................... 63, 64

*Kolling v. Dow Jones & Co.*,
  137 Cal. App. 3d 709 (1982) .............................................................. 52

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ........................................................................... 59

*Media Rts. Techs., Inc. v. Microsoft Corp.*,
    922 F.3d 1014 (9th Cir. 2019)..............................................................63

*Merrell Dow Pharms. Inc. v. Thompson*,
    478 U.S. 804, 106 S. Ct. 3229 (1986)..................................................65

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003).........................................................49, 51

*Missouri Ethics Comm'n*,
    715 F.3d 674 (8th Cir. 2013).................................................................66

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .....................................................................56, 57

*Montes v. United States*,
    37 F.3d 1347 (9th Cir. 1994).........................................................11, 36

*Mountain Home Flight Serv., Inc. v. Baxter Cty., Ark.*,
    758 F.3d 1038 (8th Cir. 2014)..............................................................66

*Nat'l Distribution Agency v. Nationwide Mut. Ins. Co*.,
    117 F.3d 432 (9th Cir. 1997)................................................................11

*O'Donnell v. Vencor Inc*.,
    466 F.3d 1104 (9th Cir. 2006)..............................................................36

*Owen v. Stokes*,
    849 F. App'x 662 (9th Cir. 2021).........................................................65

*Perez v. Mortg. Elec. Reg. Sys., Inc*.,
    959 F.3d 334 (9th Cir. 2020)................................................................37

*Pfingston v. Ronan Eng'g Co*.,
    284 F.3d 999 (9th Cir. 2002)................................................................53

*Plotkin v. Pac. Tel. & Tel. Co*.,
    688 F.2d 1291 (9th Cir. 1982)..............................................................12

*Principal Life Ins. Co. v. Robinson*,
    394 F.3d 665 (9th Cir.2005)................................................................. 38

*Pueschel v. United States*,
    369 F.3d 345 (4th Cir. 2004)............................................................... 64

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457, 127 S. Ct. 1397 (2007)................................................. 36

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
    806 F.2d 1393 (9th Cir. 1986)....................................................... 37, 66

*Sexual Minorities Uganda v. Lively*,
    899 F.3d 24 (1st Cir. 2018) ................................................................ 65

*Shaver v. F.W. Woolworth Co.*,
    840 F.2d 1361 (7th Cir. 1988)................................................. 62, 63, 64

*Southwest Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir.2003)........................................................... 37, 38

*Stone v. I.N.S.*,
    514 U.S. 386, 115 S. Ct. 1537 (1995) ................................................ 11

*Strudley v. Santa Cruz Cnty. Bank*,
    747 F. App'x 617 (9th Cir. 2019) ...................................................... 36

*Thomas v. Hickman*,
    2006 WL 2868967 (E.D.Cal. Oct.6, 2006) ....................................... 61

*Tritchler v. Cnty. of Lake*,
    358 F.3d 1150 (9th Cir. 2004)............................................................ 38

*United States v. State of Washington*,
    98 F.3d 1159 (9th Cir.1996).............................................................. 37

*Waveform Lab, Inc. v. EK Health Servs.*,
    2016 WL 1622505 (C.D. Cal. Mar. 1, 2016) .................................... 52

8

*Whitaker v. City of Houston*, Tex.,
    963 F.2d 831 (5th Cir. 1992)................................................................. 66

*White v. Relay*,
    2019 WL 5623207 (W.D. Wash. Oct. 31, 2019) ................................. 66

*Whittington v. Whittington*,
    733 F.2d 620 (9th Cir. 1984)................................................................ 37

*Williams v. I.B. Fischer Nevada*,
    999 F.2d 445 (9th Cir. 1993)................................................................ 49

*Williams v. Nevada*,
    794 F. Supp. 1026 (D. Nev. 1992) .................................................. 50, 51

*Wojciechowski v. Kohlberg Ventures, LLC*,
    923 F.3d 685 (9th Cir. 2019)................................................................ 64

*Worldwide Church of God, Inc. v. State of Cal.*,
    623 F.2d 613 (9th Cir. 1980)................................................................ 66

*Zivkovic v. S. Cal. Edison Co.*,
    302 F.3d 1080 (9th Cir.2002)............................................................... 37

## Statutes

15 U.S.C. § 1 ....................................................................................... 3, 13, 15
15 U.S.C. § 15 ......................................................................................... 11, 28
28 U.S.C. § 1291 ........................................................................................... 11
28 U.S.C § 1331 ...................................................................................... 11, 28
28 U.S.C § 1332 ...................................................................................... 11, 28
28 U.S.C § 1367 ............................................................................................ 28
42 U.S.C. § 1981 .......................................................................................... 28
*Cal. Civ. Code*, § 711 ................................................................................... 60
*Cal. Bus. & Prof. Code*, § 16756 .......................................................... 3, 14, 61

## Rules

Fed. R. App. P. 32(a)(5)................................................................................ 68

Fed. R. App. P. 32(a)(6) ........................................................................ 68

Fed. R. App. P. 32(a)(7)(B) .................................................................. 68

Fed. R. App. P. 32(a)(7)(B)(iii) ............................................................ 68

Fed. R. App. P. 32(a)(7)(C) .................................................................. 68

Fed. R. App. P. 15 .................................................................................. 37

Fed. R. App. P. 15(a) ................................................................ 35, 37, 38

## Regulations

16 C.F.R. § 801.1(b)(1)(ii) .................................................................... 53

## **JURISDICTIONAL STATEMENT**

Subject matter jurisdiction over Plaintiffs–Appellants' Complaint, First

Amended Complaint, and Second Amended Complaint arose in the district court

under federal question jurisdiction, as Plaintiffs–Appellants alleged a Cause of

Action for Sherman Act Damages.  28 U.S.C § 1331; 15 U.S.C. § 15; ER-281–82;

ER-271–72; ER-172–73.

Subject matter jurisdiction also arose under diversity jurisdiction, 28 U.S.C §

1332, because complete diversity existed between the Plaintiffs–Appellants and

Defendants–Appellees.  *Id.*

Appellate jurisdiction arises under 28 U.S.C. § 1291.  Although the lower

court's March 2, 2022 order does not clearly provide for the dismissal of the entire

action, *see Montes v. United States*, 37 F.3d 1347, 1350 (9th Cir. 1994), on May

11, 2022, the district court explicitly held that it would *not* entertain a request for

leave to amend under Rule 15.  ER-9–10.  The May 11, 2022 order "clearly

evidence[d] the judge's intention that it be the court's final act in the matter."

*Nat'l Distribution Agency v. Nationwide Mut. Ins. Co*., 117 F.3d 432, 433 (9th Cir.

1997).  Appellate jurisdiction is accordingly proper.

Appellate jurisdiction further lies over the district court's denial of

Plaintiffs–Appellants' March 31, 2022 motion to file a Third Amended Complaint

under Rule 15(a), Rule 59(e), and Rule 60(b).  *Stone v. I.N.S.*, 514 U.S. 386, 401,

11

115 S. Ct. 1537, 1547 (1995); *Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004); *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1292 (9th Cir. 1982).

No judgment set forth on a separate document was ever entered in the lower court. ER-292–99. The March 2, 2022 order dismissing the Second Amended Complaint was *not* an order excepted by Rule 58(a) from the separate-document requirements. Consequently, the deadline to appeal ran no earlier than August 30, 2022.

Plaintiffs–Appellants' May 26, 2022 Notice of Appeal timely appealed from all appealable orders in the lower-court action. ER-289–90.

## **ISSUE(S) PRESENTED**

1.　Under the single entity rule established in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731 (1984) and *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003), could the district court reach a pleading-stage determination that (1) All Star Travel Group; and (2) the Tzell/Travel Leaders Appellees constituted a single economic unit, and were therefore incapable of engaging in "concerted action" under 15 U.S.C. § 1, given that FlightBlitz's dismissed Second Amended Complaint had explicitly alleged that the alleged conspirators had entered into a *contractual agreement* to *preserve* their pre-existing independence of governance? ER-190–91, ¶ 151.

2.　Should this Circuit adopt the Eleventh Circuit's framework for applying *American Needle, Inc. v. National Football League*, 560 U.S. 183, 130 S. Ct. 2201 (2010), and find that scrutiny regarding All Star Travel Group's and the Tzell/Travel Leaders Appellees' ability to compete must "[f]or starters" commence with considering the contractual arrangements between them? *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1256 (11th Cir. 2022).

3.　Should the Ninth Circuit give California's Cartwright Act a narrower construction than the Eleventh Circuit in *Arrington* afforded to 15 U.S.C. § 1?

13

4.     Does section 16756 of the *California Business & Professions Code* substantively entitle Cartwright Act plaintiffs to utilize pleading standards less rigorous than *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)?

5.     Could FlightBlitz move under Rule 15(a) to amend with a new and different pleading after its Second Amended Complaint had been dismissed with prejudice, but before the action had been terminated and before any judgment had been entered?

## STATEMENT OF THE CASE

The dismissed SAC alleged a federal Sherman Act § 1 cause of action and California Cartwright Act action for "retail price maintenance" (RPM), contending that the Tzell–TLG Appellees had participated in a vertical price-fixing conspiracy to set a price floor on commissions paid to FlightBlitz[1] by nonparty All Star Travel Group ("ASTG"). ER-185, ¶ 110. The district court found that ASTG and Tzell–TLG Appellees were to be considered a single entity for antitrust purposes and dismissed FlightBlitz's SAC for failure to state a claim. ER-89–96.

### A. Summary of the SAC's Allegations Regarding Commission Pricing in the "Hosted" Travel Agent Market

FlightBlitz alleged that it, the Tzell Appellees, Appellee Travel Leaders Group, LLC ("TLG"), and nonparty ASTG were all travel agents operating in the "hosting–hosted" travel agent industry. ER-173–74, ¶¶ 22, 25–28; ER-175, ¶¶ 40–42; ER-177–79, ¶¶ 55–64, 68; ER-180, ¶ 74. FlightBlitz alleged that common carriers (*e.g.*, United Airlines, American, Delta, *etc.*) pay commissions to travel agents for selling airfare, cruise, and hotel bookings. ER-173, ¶ 25.

---

[1] Plaintiff–Appellant Kaye f/d/b/a FlightBlitz changed its business form from a sole-proprietorship to a corporation, and Plaintiffs–Appellants alleged that FlightBlitz, Inc. is the successor-in-interest and/or assignee of David Kaye f/d/b/a FlightBlitz. ER 172–73, ¶¶ 23–4; 272, ¶¶ 23–24. Kaye and FlightBlitz assert identical claims, and, for simplicity, this Brief collectively refers to the Appellants as "FlightBlitz."

FlightBlitz alleged that certain consumers—generally, consumers that spend significant sums on travel—seek travel agencies that provide responsive and customized customer service and that can preserve institutional memory regarding the client's needs and preferences. ER-174, ¶ 27. Such clients seek travel agents with industry skill and expertise in creating customized vacation packages and corporate-retreat packages. *Id*. The SAC describes the market sector providing such services to high-spend travelers as "concierge travel" agents. *Id*., ¶ 28.

FlightBlitz alleged that common carriers seek business from the "concierge travel service" industry, and that common carriers have financial incentive to pay a portion of a consumer's retail fare price as a commission to travel agents. ER-174, ¶¶ 30–33. Concierge travel agents use such commissions to subsidize the services, amenities, customer-service personnel, and other conveniences provided by those travel agent. ER-174–75, ¶¶ 34–37. Absent such commissions, travel agents would need to charge significantly higher premiums for the concierge travel services that they provide to their clients.

Travel agents do not always negotiate commission rates directly with common carriers. ER-174, ¶ 38. Commission rates are often based on the sales volumes anticipated by the common carrier under the relevant commission contract. *Id.* ¶¶ 39–43. This has given rise to the market for "hosting–hosted" agents—a hierarchy of affiliated agents who utilize and access the commission

16

rates negotiated directly between the apex agent ("hosting agent") and common carriers. *Id.* The apex hosting agent ("host agency") then resells access to those commission rates, for airfares booked *through* the host agent's common-carrier contracts, to travel agents with smaller sales' volumes. *Id.*; ER-173, ¶ 48; ER-180–81, ¶¶ 73–75; ER-184–85, ¶¶ 102–09.

Host agencies enter agreements with their hosted agents to define the "commission splits" between them. ER-176, ¶ 48. Smaller hosted agents commonly accept 80–20 splits, meaning that, for each airfare booked by the hosted agent through the hosting agent's common-carrier contract, the hosting agent pockets 20% from the commissions paid by the common carrier and the remaining 80% of the commission is paid out to the hosted agent who interacted with the consumer and that booked the fare or accommodation. ER-184, ¶¶ 108–109 & n.2.

"Hosted agents" will often, themselves, become "hosting agents," through further reselling to yet-smaller travel agencies its contracted access to the higher-situated agent's commission contract. *Id.*, ¶¶ 106–107. For instance, Tzell: (1) directly sells airfares retail to consumers, ER-180, ¶ 74; (2) and further hosts "branch" agencies through providing those "branches" with contracted access to Tzell and TLG's common-carrier commission contracts, *id.*; ER-184, ¶¶ 104–05; and (3) further hosts non-branch and independently-owned "independent contractor" ("IC") travel agents, through providing those IC's with contracted

access to Tzell and TLG's common-carrier commission contracts. *Id.*; *see also* ER-195 ¶ 190. Hosted agents and branches could, in turn, further resell such access to yet other travel agents. ER-180, ¶¶ 74; ER-184, 104–109. Accordingly, an airfare purchased by a consumer might be sold through the following hypothetical distribution line: Delta Airlines to Tzell; Tzell to ASTG; ASTG to FlightBlitz; FlightBlitz to a FlightBlitz independent contractor ("IC 1"); IC 1 to IC 2; and IC 2 to the consumer. *Id*.

At each step of the distribution scheme, individualized contracts between the hosted agent and its hosting agency define the distribution of commissions between them. ER-176 ¶ 48; ER-184 ¶¶ 104–109. Percentages are potentially deducted by every intermediary in the distribution chain. *Id*.

Commission rates are generally determined by sales volumes. ER-175, ¶¶ 38–39. Travel agencies with billions in annual airfare sales have sufficient negotiating power for obtaining optimal commission rates directly from common carriers. *Id.* Conversely, smaller travel agents obtain superior commissions through purchasing airfares through Tzell, or a Tzell branch, over direct negotiations with a common carrier. ER-175, ¶¶ 38–39, 42; ER-189 ¶¶ 141–42; *see also* ER-200, ¶¶ 210, 217; ER-179, ¶ 67. The hosted–hosting travel agent for airfare is dominated by three companies, Tzell/TLG, Frosch, and Ovation, with Tzell/TLG hosting approximately 85% of hosted agents associated with a major

18

host agency. ER-177–179, ¶¶ 60–67. In 2018, Tzell/TLG's annual airfare sales were pegged at more than $3.3 billion. ER-178.

Entering such hosting relationship benefits the lower-situated agent through providing it with commission levels greater than such agent could expect to obtain directly from a carrier. ER-175, ¶¶ 38–39; *see also* ER-188, ¶ 131. The hosting agent (*e.g.*, ASTG) also benefits through retaining commission "splits," ER-175, ¶ 43; *see also* ER-182, ¶ 88; *cf.* ER-188–89, ¶¶ 134, 139–41, <u>as well as</u> through aggregating the hosted agent's (*e.g.*, FlightBlitz's) purchasing power with its own, thereby boosting the hosting agent (*e.g.*, ASTG) in *its* negotiations against its own upstream counterpart (*e.g.*, Tzell). ER-175, ¶¶ 41–43, 47; *see also* ER-185, ¶ 114.

**B.** **Appellants' Allegations Regarding Odaka and ASTG's Initial Contract**

The SAC alleged that, in late 2017, FlightBlitz had been purchasing airfares through Appellee Tzell, and that FlightBlitz sought to negotiate a more-competitive contract that could provide FlightBlitz greater commission on fares that it sold. ER-185, ¶ 113. To such end, Kaye organized a purchasing group that sought to collectively aggregate their purchasing power for purposes of extracting the most favorable commission levels from the hosted-agent market. ER-188, ¶¶ 129–131. FlightBlitz had obtained an offer from Carlisle Travel Group ("Carlisle"), a Tzell "branch" agency, for FlightBlitz's group to deliver $10 million in annual sales in exchange for 100% on direct commissions and 0% on overrides

commissions.  *Id*., ¶¶ 132–34; *see also ER*-176 ¶¶ 44–47 (explaining the distinction between direct commissions and override commissions).

At the relevant time, late 2017, FlightBlitz shared numerous business connections with nonparty ASTG.  ER-185–86, ¶¶ 114–17.  ASTG's principal, Odaka, and Kaye frequently discussed their shared perceptions that Tzell and TLG were inept in adapting informational technologies for servicing hosted travel agents.  ER-186, ¶ 117.  Kaye and Odaka discussed their belief that Tzell and TLG were vulnerable to being upstaged by a competitive upstart.  ER-186–87, ¶¶ 119–27.  Odaka believed that through developing software products, and other informational technologies, ASTG could lure travel agents away from Tzell and TLG.  *Id.*  Odaka sought to fill market needs that Tzell and TLG had neglected: "building a services-and-technology oriented platform that would attract [travel agents] to ASTG's umbrella."  *Id*., ¶ 126; *id.*, ¶ 127.

On February 18, 2018, Odaka invited Kaye to a meeting at Odaka's residence.  ER-186, ¶ 118.  At that meeting, "Kaye expressed interest in moving [FlightBlitz away from] Tzell [to become hosted under] ASTG, but only if ASTG could offer competitive terms."  ER-187, ¶ 128.  Kaye advised Odaka that FlightBlitz would agree to sign on with ASTG—as explained, ASTG was also a "Tzell" branch agency—if ASTG offered FlightBlitz 100% on direct commissions *as well as* 50% on overrides commissions.  ER-189, ¶¶ 137–40.  Odaka responded

that ASTG would provide those terms, and that ASTG would pay FlightBlitz 100% on direct commissions *as well as* 50% on overrides commissions, if FlightBlitz joined ASTG as the latter's independent contractor and delivered $10 million in annual sales. ER-189, ¶ 141. At that meeting, on February 18, 2018, Kaye and Odaka agreed to those price terms, and Kaye and Odaka shook hands on those terms. ER-190, ¶ 144.

On about February 20, 2018, Odaka advised Kaye that he had discussed such deal with Tzell's Chris Griffin (VP, Branch Relations) and Tzell's Gail Grimmett (CEO), and Travel Leaders's Peter Vlitas (Executive Vice President). *Id.*, ¶ 145. Odaka conveyed that Tzell's management had represented to him that FlightBlitz was receiving substantially less commissions under its FlightBlitz–Tzell IC agreement,[2] and that Kaye had conned Odaka into offering overly generous commissions. *Id.* Kaye responded with the specifics of the 100%-direct-commissions-but-0%-overrides-commissions Carlisle had offered. ER-189, ¶¶ 146–47. Odaka updated the aforementioned executives at Tzell that FlightBlitz had secured from Carlisle an alternative offer for 100% direct commissions, and that Odaka therefore needed to outbid Carlisle. *Id.*

---

[2] As stated, FlightBlitz had been operating on an 80–20 split.

After such conversations, Odaka advised Kaye that that Tzell's Gail Grimmett and TLG's Peter Vlitas were "not letting him do the deal." *Id.*, ¶ 148. Odaka advised Kaye that Grimmett and Vlitas advised that only the "big boys" received the "big" deals, and that "New York" was refusing to approve the deal between Odaka and Kaye. *Id.*, ¶ 149. Odaka was apologetic, and repeatedly acknowledged that a "deal is a deal"; that he was a man of his word; and that he intended to honor the deal he had shaken hands over. *Id.*, ¶ 150.

In what is perhaps the key allegation underpinning this appeal, FlightBlitz alleged:

> At that meeting, or (*sic*) about February 24, 2018, Odaka told Kaye that he had full control over ASTG. Odaka told Kaye that "he could do whatever he wanted with ASTG's contract," that "his lawyers were very clever, and they ensured that he retained full control over his company" despite selling Tzell a majority equity stake, that "he did not need anyone's permission" to give FlightBlitz a 100% commission deal; that even if Tzell's management objected, "he had the final say" in what ASTG did.

ER 190–91, ¶ 151. Odaka explained that even though he had full legal capacity to authorize the 100%-commission deal between ASTG and FlightBlitz, he was, nonetheless, concerned about being "blacklisted" by Tzell and TLG. ER-191, ¶ 152. Odaka explained that Tzell and TLG were the "kingpins" of airfare sales and that Tzell had the power to ensure that a "blacklisted" agent would never be

able to build a business in the retail airfare space.[3]  *Id.*, ¶ 153. Odaka represented that Tzell had a history of blacklisting "undesirables" through advising airlines, hotel networks, and other key travel providers to avoid dealings with the blacklisted agent.  *Id.*, ¶ 154.  Blacklisted agents could reasonably expect to be relegated to, at best, permanent limbo as an IC under some competing network, such as Frosch or Ovation.  *Id.*, ¶ 155.  FlightBlitz alleged that Tzell was reasonably believed to possess sufficient market clout to blacklist agents.  *Id.*

During such conversations, Odaka would refer to Tzell's principals as the "mafia."  *Id.*, ¶ 163.  Indeed, throughout Odaka and Kaye's subsequent dealings, Odaka would constantly describe Tzell and TLG's management as being "literally like the mafia."  ER-195, ¶ 186; *see also id.*, ¶ 185.

FlightBlitz alleged that various subsequent events provided significant corroboration to Odaka's represented consternation regarding Tzell's boycott behaviors.  ER-191–92, ¶¶ 156–163.  For instance, salacious allegations have surfaced regarding a sexist culture atypical for a multi-billion-dollar brand.  ER-192, ¶ 161.

---

[3] For instance, FlightBlitz alleged that Tzell is understood to be Delta Airlines's largest customer.  *Id.*

### C. Allegations Regarding Tzell and ASTG's Agreement to Fix Pricing on ASTG's Contract with FlightBlitz

After being advised that ASTG would not honor the agreed price terms, FlightBlitz broke off further negotiation (Kaye "told Odaka the deal was off"). ER-192, ¶ 164. "Odaka, however, pitched the alternative deal structure that eventually became the ASTG–FlightBlitz contract." *Id.*, ¶ 165. "Odaka represented that he would be able to convince TLG to **agree** to a commission structure that allowed TLG to collect 10% commissions up to $5 million in sales and 5% commissions to TLG for the next $2.5 million in sales." ER-193–94, ¶¶ 166–67 (emphasis in original). "Odaka pitched the revised offer to TLG's principals between February 24, 2021 and March 1, 2021." ER-193, ¶ 168. "There was continued resistance, and Odaka advised Kay that he needed to make at least five phone calls to secure consent." *Id.*, ¶ 169. "Odaka specifically identified Peter Vlitas of TLG and Gail Grimmett of Tzell as those opposed to providing the sought commissions." *Id.*, ¶ 169. "Thereafter, TLG's principals approved the reduced commissions." *See id.*, ¶¶ 170–76. "Odaka explained to Kaye that he had been strongarmed, through the threat of boycott, into raising prices." ER-194, ¶ 179.

> Odaka specifically explained that: (1) Odaka sought to provide more competitive pricing (particularly because, as explained above, Odaka nearly lost FlightBlitz to Carlisle); (2) Odaka had full contractual authority to provide that competitive pricing; and (3) Odaka expressed that he had been threatened with extracontractual boycott behaviors.

24

*Id.* Due to Tzell's interference, Odaka further imposed other contractual terms damaging to FlightBlitz. ER-193–94, ¶¶ 171–75; ER-195, ¶¶ 187–88. As a result of such price-fixing, FlightBlitz suffered damages. ER-223, ¶¶ 223–24.

### D. *Iqbal* Sufficient Allegations Regarding the Conspirators "Independent Centers of Decisionmaking"

After the Court's initial order dismissing FlightBlitz's FAC with leave to amend, ER-203, FlightBlitz filed a SAC alleging numerous additional allegations demonstrating—with, at minimum, *Iqbal* sufficiency—that "independent centers of decisionmaking" activity had joined into imposing the RPM pricing. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195, 130 S. Ct. 2201 (2010).

First, FlightBlitz alleged that ASTG's efforts at *outbidding* the commissions Tzell had been paying FlightBlitz ran contrary to any notion that ASTG and Tzell operated as a "single economic unit." ER-188, ¶ 136. ASTG's position at the February 18, 2018, meeting—soliciting FlightBlitz was from Tzell—constituted *open* competition with Tzell. *Id.* ASTG "sought to have Kaye move away from Tzell—with Tzell taking 20% on all commissions earned by FlightBlitz—and join ASTG [for 0% direct commissions], to the loss of those [20%] commission [FlightBlitz had been paying] to Tzell." *Id*.

Second, ASTG communicated to FlightBlitz that ASTG sought to entice FlightBlitz to join ASTG as an ASTG-hosted agent *because* ASTG sought

FlightBlitz's assistance in building informational technologies that ASTG could use to *compete* with Tzell's core business. ER-189, ¶ 142; ER-181, ¶¶ 82–84.

Third, after FlightBlitz became an ASTG-hosted independent contractor, FlightBlitz witnessed strong antagonism by ASTG against Tzell. ER-181, ¶ 86. FlightBlitz would hear comments such as: "Don't share our secrets with Tzell; they are the competition"; "[Tzell will] going to steal our methods and secrets, in order to steal agents." *Id.* ASTG would instruct its hosted IC travel agents *not* to share information with Tzell regarding the methods and products that ASTG had been developing. ER-182, ¶ 89.

Fourth, Odaka repeatedly expressed animus towards Tzell. Odaka repeatedly told Kaye that "Tzell was jealous of his success." ER-182, ¶ 90. Odaka represented to Kaye on various occasions that ASTG was the tenant on the lease for the office space ASTG shared with Tzell, and Odaka would tell Kaye, "if I want, I can kick [Tzell] out of the [11111 Santa Monica] suite." ER-182, ¶ 91. Odaka also thought it was below ASTG's dignity to hold itself out as an ancillary agency to Tzell. *Id.* ¶ 92.

Fifth, Tzell and ASTG explicitly tasked employees with competing with each other. *Id.*, ¶ 93. Furthermore, Tzell branches were engaged in open competition with each other, including threating legal action against each other due to competitive *harms* inflicted between Tzell branches. ER-194, ¶¶ 181–83.

Sixth, Tzell made secret attempts at poaching FlightBlitz away from ASTG, and Tzell placed emphasis on keeping such communications secret. ER-182–83, ¶¶ 94–95.

Seventh, Odaka encouraged FlightBlitz to pursue relationships and contracts that Tzell had specifically sought to prohibit FlightBlitz and ASTG from pursuing. ER-183, ¶¶ 96–97; 100.

Eighth, ASTG and Tzell utilized conflicting "exclusive deals" for hotel networks. *Id.*, ¶ 101. Tzell was contracted with Signature hotels, and ASTG was contracted with Virtuoso. *Id.* It was represented to Kaye that Virtuoso and Signature were exclusive networks, and that agents with access to the one were categorically precluded from having any access, whatsoever, to the other. *Id.* It was represented to Kaye that ASTG's ICs and Tzell's ICs needed to be kept strictly segregated from accessing each other's hotel networks. *Id.*

Ninth, Odaka would refer to Tzell and TLG's management as being "literally like the mafia." ER-195 ¶ 186. Odaka would represent that, in order to retain status in Tzell and TLG's graces, it was necessary to voluntarily pay 5% of profits as noncontractual "homage"—"homage" being the word Odaka used. ER-

195, ¶ 185.[4]  Such allegations assert—or, at minimum, provide *Iqbal*-sufficient

inferences—that Tzell and TLG's influence over ASTG derived from relationships

and influences that the antitrust laws seek to curtail.

### E.  Procedural History and Parties

On March 8, 2021, FlightBlitz, Inc. filed a Complaint in the Central District

of California alleging: (1) a Cause of Action for Cartwright Act Violations; and (2)

a Cause of Action for Sherman Act Violations.  ER-280.  The Complaint named

Tzell Travel, LLC, Tzell Holdings, LLC, and Travel Leaders Group, LLC as

Defendants.  ER-281.  FlightBlitz alleged that subject-matter jurisdiction arose

under federal-question jurisdiction, 28 U.S.C § 1331, Sherman-Act exclusive

jurisdiction, 15 U.S.C. § 15, diversity jurisdiction, 28 U.S.C § 1332, and

supplemental jurisdiction, 28 U.S.C § 1367.[5]  ER-281.

On July 6, 2021, Appellants filed a First Amended Complaint ("FAC")

joining as a plaintiff "David Kaye, an individual formerly doing business as

FlightBlitz."  ER-269–70.  The FAC alleged that, in 2019, Kaye f/d/b/a changed its

---

[4] Indeed, the very notion of noncontractual homage in the American boardroom ought to be sufficient, in and of itself, to overcome any Rule 12(b)(6) attempt to dismiss a boycott claim under § 1 of the Sherman Act.  Any use of noncontractual payments for purposes of currying favor—an arrangement that would bear strong odors of corporate bribery—should suffice, under *Iqbal*, for alleging the existence of a boycott arrangement.  It is probable, and not merely possible, that actors paying noncontractual payments for purposes of currying favor would be dependably relied upon to participate in the alleged boycott.
[5] Due to a drafting error, 42 U.S.C. § 1981 was referenced, but no civil rights claims were asserted in the Complaint, FAC, or SAC.

28

business form from a sole-proprietorship to a corporation, and that FlightBlitz, Inc. was the successor-in-interest and/or assignee of David Kaye f/d/b/a FlightBlitz. ER-272, ¶¶ 23–24. The FAC continued to name Tzell Travel, LLC and Tzell Holdings, LLC as Defendants. ER-270, ¶¶ 13–16. The FAC amended "Travel Leaders Group, LLC" to name "Travel Leaders Group, LLC d/b/a Internova Travel Group." *Id.* The FAC further sued "Tzell Travel Group, LLC" as the *idem sonans* that the other Tzell Defendants transacted under. ER-270, ¶ 16.[6] "Tzell Travel Group, LLC" appeared through joining into the Parties' stipulation to extend Defendants' time to respond to the First Amended Complaint. *See* ER-266–67.

On August 19, 2021, the defendants filed their corporate disclosure statements and identifications of interested parties. ER-263–65. The disclosure statement represented that "Travel Leaders Group, LLC d/b/a Internova Travel Group" constituted a name used by different entities, and that "Internova Travel Group" was the d/b/a for Travel Leaders Group Holdings, LLC. ER-264. The disclosure statement identified Travel Leaders Group Holdings, LLC as the 100% owner of Travel Leaders Group, LLC; the latter as the 100% owner of Tzell Holdings, LLC; and the latter as the 100% owner of Tzell Travel, LLC. ER-264.

---

[6] The FAC alleged that "Tzell Travel Group, LLC" was not registered to business in the State of California and was not formed under the laws of the State of California. *Id.*

Travel Leaders Group, LLC was served on June 4, 2021.  ER-277.  Internova

Travel Group was never served separately from Travel Leaders Group, LLC, and

Appellants' Second Amended Complaint simply kept the allegations against

"Travel Leaders Group, LLC d/b/a Internova Travel Group" without amending to

name them as separate parties.  ER-170.

On August 19, 2021, the "Defendants" filed a motion to dismiss the first

amended complaint under Rule 12(b)(6) for failure to state a claim.[7]  ER-242–43.

On November 29, 2021, the district court granted the motion, and the district court

dismissed the FAC with leave to amend.  ER-203–14.  On December 10, 2021,

Plaintiffs–Appellants FlightBlitz, Inc. and David Kaye f/d/b/a FlightBlitz filed

their Second Amended Complaint against the same entities named in the FAC: (1)

Tzell Travel, LLC; (2) Tzell Holdings, LLC; (3) "Travel Leaders Group, LLC

d/b/a Internova Travel Group"; and (4) Tzell Travel Group, LLC.  ER-170–72,

¶¶ 13–16.  All Plaintiffs alleged, as against all Defendants: (1) a Cause of Action

for "California Cartwright Act Violations (Price Fixing)"; and (2) a Cause of

---

[7] It is not ascertainable from the record below whether "Internova Travel Group" made an appearance.  The Appellees' moving papers never made any effort to separately identify who the moving parties were.  Neither the "Defendants'" notice of motion, nor Counsels' signature block, identified the identities of those moving "Defendants."  *See generally* ER 242–62.

Action for "Sherman Act Violations; Clayton Act § 4 (Price Fixing)." *See generally,* ER-170; ER-185–201.

On January 24, 2022, the "Defendants" filed a motion to dismiss Plaintiffs–Appellants' Second Amended Complaint under Rule 12(b)(6) for failure to state a claim. ER-150–51.[8] Neither Defendants' moving papers, nor Defendants' Notice of Motion under CACD L.R. 7-4, sought dismissal of the *action*. *Id*. The district court heard oral argument on February 22, 2022. ER-97–113. On March 2, 2022, the district court ordered the Second Amended Complaint dismissed with prejudice. ER-89–96. The March 2, 2022 did *not* specify that the action was terminated, but the order was stamped "JS-6." *Id*. No Rule 58 judgment was ever filed, and no proposed judgment was ever submitted by Defendants. ER-294–99.

On March 31, 2022, FlightBlitz, Inc. and David Kaye f/d/b/a FlightBlitz moved under Rule 15(a), Rule 59(e), and Rule 60(b) for leave to file a proposed Third Amended Complaint alleging an Unruh Cause of Action and seeking supplemental jurisdiction. ER-55–86. Appellants advised the district court that other litigation was pending between the parties, and Appellants moved the district court to decline supplemental jurisdiction over those claims in the first instance.

---

[8] Once again, neither the "Defendants'" notice of motion, nor Counsels' signature block, identified the identities of the moving "Defendants." *See generally* ER 150–69.

ER-70.  Appellants further moved that "[i]f, for any reason, the [district court] believes that the exercise of supplemental jurisdiction is available and warranted, then [Appellants] respectfully move for leave to file a Third Amended Complaint alleging the same Unruh Act claims [as] the pending state-court lawsuit."  ER-60.

On May 11, 2022, the district court held that determining whether the district court would exercise supplemental jurisdiction would constitute an advisory opinion.  ER-8–9.  The district court further opined that after Plaintiffs–Appellants' pleading had been dismissed with prejudice, amendment under Rule 15 could no longer be sought.  ER-9–10.  The district court further opined that Plaintiffs could not seek relief under Rule 59(e) or under Rule 60(b).  ER-10–11.  No Rule 58 judgment was submitted or filed.  ER-294–99.

On May 26, 2022, Plaintiffs FlightBlitz, Inc. and David Kaye f/d/b/a FlightBlitz timely appealed.  ER-289–92.

## <u>SUMMARY OF THE ARGUMENT</u>

### A.   Summary of Appellants' Appeal of the District Court's Order Dismissing the SAC for Failure to State a Claim Under the Sherman Act or Cartwright Act

The central issue in this appeal is the district court's overbroad application of the single entity rule.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731 (1984).  In *Copperweld*, the Supreme Court held that "coordinated activity of a parent and its wholly owned subsidiary must be viewed

32

as that of a single enterprise for purposes of § 1 of the Sherman Act." 467 U.S. at

771, 104 S. Ct. at 2742; *Jack Russell Terrier Network of N. Ca. v. Am. Kennel*

*Club, Inc*., 407 F.3d 1027, 1034 (9th Cir. 2005) ("*Copperweld*'s reasoning [is]

sometimes referred to as the 'single-entity' rule") (punctuation altered). "Section

1, like the tango, requires multiplicity: A company cannot conspire with itself."

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003), *as*

*amended on denial of reh'g* (Apr. 24, 2003).

The district court, Senior District Judge Honorable Consuelo B. Marshall,

dismissed the SAC with prejudice based on the so-called "single entity" rule. ER-

89–96. To quote the district court:

> [FlightBlitz] argues notwithstanding Tzell's partial ownership of
> ASTG, the SAC pleads sufficient facts that ASTG's controlling
> executive Odaka represented himself as controlling somewhere
> between 51%-100% of the management rights in ASTG and had
> sufficient managerial interests to unilaterally wield ASTG's
> management authority despite Defendants' objections. (Opp. at 14-15
> (citing SAC ¶ 151 ("Odaka told Kaye that he had full control over
> ASTG," "he could do whatever he wanted with ASTG's contract,"
> "his lawyers were very clever, and they ensured that he retained full
> control over his company" despite selling Tzell a majority equity
> stake," "he did not need anyone's permission" to give FlightBlitz a
> 100% commission deal," and "even if Tzell's management objected,
> 'he had the final say' in what ASTG did"); *id*. ¶ 91 ("Odaka
> represented to Kaye on various occasions that ASTG, and not Tzell,
> was the tenant on the lease for their office space; and Odaka went so
> far to tell Kaye, 'if I want, I can kick them out of the [11111 Santa
> Monica] suite.'") . . . .
>
>         . . . .

33

In *Freeman*, the Ninth Circuit noted that in situations involving "the ***absence*** of economic unity," some courts have found a single entity existed despite the fact the entities were independently owned where there was no evidence that the entities were or had been actual or potential competitors. *Freeman*, 322 F.3d at 1148 (emphasis added). However, here the SAC alleges substantial common ownership between Tzell and ASTG. Therefore, the SAC's allegations regarding alleged competition between Tzell and ASTG are irrelevant in determining whether Tzell and ASTG must be treated as a single entity. *See id*. Because the SAC alleges Defendant Tzell had majority ownership of ASTG, Defendants and ASTG must be treated as a single entity which could not have conspired with itself in violation of Section 1 of the Sherman Act. *Id*.

ER-95–96 (emphasis in original). No published Ninth Circuit opinion has addressed the specific issue raised in this appeal. The dismissed Second Amended Complaint ("SAC") alleged that one of the alleged conspirators (Appellees) had *acquired* a majority *non-governance* equity position in the co-conspirator ("ASTG") through a transaction that *specifically excluded* management rights. ER-190–91, ¶ 151. The alleged that the transaction reserved managerial control to Odaka, the managing-agent-and-selling-owner of ASTG. *Id.* The SAC alleged that two sophisticated parties—Appellees and ASTG—had *negotiated* an agreement defining their relationship as *separately* commanding "independent centers of decisionmaking." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195, 130 S. Ct. 2201, 2212 (2010).

Appellants' contention is simple: nothing in *Copperweld* precludes parties from *contracting* to preserve their disunity. The district court improperly applied a *conclusive* presumption of unitary economic motive in derogation of a *contractual* acquisition structure, hammered out between sophisticated parties, that reserved to each entity *disparate* economic motive.

Appellants contend that *Freeman* does *not* stand for the proposition that the district court cited it for; that the district court could not ignore the allegations that the Appellees and ASTG had *contracted* to retain Odaka's independent managerial control over ASTG, *see* 190–91, ¶ 151, and that even if *Freeman* could be read to support the district court's conclusion, such reading would be irreconcilable with the Supreme Court's subsequent treatment of the single entity rule in *American Needle*. Appellants further contend that the Eleventh Circuit, in *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1255 (11th Cir. 2022), interpreted *American Needle* in precisely the same manner as FlightBlitz herein.

**B.     Summary of Appellants' Appeal of the District Court's Order Declining to Grant Leave for Appellants to File Different Claims**

After the district court dismissed the SAC with prejudice, through an order that did *not* explicitly terminate the action, *see* ER-96, Plaintiffs moved under Rule 15(a) of the Federal Rules of Civil Procedure to file a Proposed TAC containing a *different* controversy between FlightBlitz and Appellees. *See ER*-55–88. In seeking to amend, Appellants were entitled to *disclaim* diversity jurisdiction,

35

*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474, 127 S. Ct. 1397, 1409 (2007); *Strudley v. Santa Cruz Cnty. Bank*, 747 F. App'x 617, 618 (9th Cir. 2019); *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 92 (1st Cir. 2008) ("no court has ever read the time-of-filing rule to bar a plaintiff from switching jurisdictional horses"); see *also O'Donnell v. Vencor Inc*., 466 F.3d 1104, 1111 (9th Cir. 2006) ("second complaint does not 'relate back' . . . [when it is] not an 'amendment' . . . but rather a separate filing"); *In re iBasis, Inc. Derivative Litig*., 551 F. Supp. 2d 122, 125 (D. Mass. 2008) ; *cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 201 L. Ed. 2d 924, 138 S. Ct. 2448, 2462 (2018), and Appellants did so. ER-68–69; ER-76 ¶ 6.

The district court declined to determine whether supplemental jurisdiction existed, because the district court believed that FlightBlitz was seeking an advisory opinion. ER-8–9. The district court cited no authority or legal standard in support of its finding. Applying this Circuit's controlling standard, Appellants were *not* seeking an advisory opinion. *Ctr. for Biological Diversity v. United States Forest Serv*., 925 F.3d 1041, 1048 (9th Cir. 2019).

Next, the district court's denial of leave to amend was erroneous as a matter of law. This Court has long recognized the distinction between termination of an action and the dismissal of a pleading. *Montes v. United States*, 37 F.3d 1347, 1350 (9th Cir. 1994). Here, the SAC was dismissed but the action had not been

terminated.  Although, as noted by the district court, "the case was closed by the clerk," ER-9 ln. 21, there had been *no* judicial instruction for the clerk to do so. *See* ER-96.  Nor had there been any determination that FlightBlitz "could not save his suit by any amendment."  *Whittington v. Whittington*, 733 F.2d 620, 621 (9th Cir. 1984).  Because a case-termination order had not issued, the case remained open and FlightBlitz could seek relief under Rule 15.  *Czeremcha v. International Association of Machinists and Aerospace Workers*, 724 F.2d 1552, 1556 (11th Cir.1984); *see also Schreiber Distrib. Co. v. Serv-Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986).

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for failure to state a claim.  *Perez v. Mortg. Elec. Reg. Sys., Inc*., 959 F.3d 334, 337 (9th Cir. 2020).

This Court reviews the district court's denial of leave to amend under Rule 15(a) for abuse of discretion.  *Zivkovic v. S. Cal. Edison Co*., 302 F.3d 1080, 1087 (9th Cir.2002).  Determining whether such a denial rests on an inaccurate view of the law, and therefore constitutes an abuse of discretion, *see United States v. State of Washington*, 98 F.3d 1159, 1163 (9th Cir.1996), requires reviewing the underlying legal determination *de novo*.  *See Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003) (*en banc*) (per curiam).  Here,

the district court's denial of leave to amend was predicated on its belief that Rule 15(a) could not be invoked after Plaintiffs–Appellants' operative pleading had been dismissed with prejudice. ER-9–10. Under *Southwest Voter Registration*, such "underlying legal determination" is reviewed *de novo*. 344 F.3d at 918.

The district court ruled that FlightBlitz was seeking an advisory opinion regarding supplemental jurisdiction. Ordinarily, the denial of supplemental jurisdiction is reviewed for an abuse of discretion. *Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1153 (9th Cir. 2004). FlightBlitz maintain that this Court reviews *de novo* the district court's determination Appellants had sought an advisory opinion. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir.2005) (stating standard of review for decisions on ripeness and jurisdiction).

## II. THE SINGLE ENTITY RULE DID NOT BAR FLIGHTBLITZ'S CLAIMS, BECAUSE THE ALLEGED CONSPIRACY OCCURRED BETWEEN INDEPENDENT CENTERS OF DECISIONMAKING

### A. The Single Entity Rule Has No Application to Entities that have *Bargained* to Preserve Ongoing Competition Between them

The district court fundamentally misapplied *Freeman* and *Jack Russell*. Where entities have *contracted* to preserve their pre-existing "independent centers of decisionmaking," *American Needle*, 560 U.S. at 195, 130 S. Ct. at 2212, continuing competitiveness has been preserved *by* the free operation of the marketplace. Where a party explicitly bargained to preserve its ability to compete, it would turn antitrust law on its head to suppose that they are not in competition.

38

The SAC alleged Odaka's representation that—

> he could do whatever he wanted with ASTG's contract," that "his
> lawyers were very clever, and they ensured that he retained full
> control over his company" despite selling Tzell a majority equity
> stake, that "he did not need anyone's permission" to give FlightBlitz a
> 100% commission deal; that even if Tzell's management objected, "he
> had the final say" in what ASTG did.

ER 190–91, ¶ 151. The SAC alleges that Tzell bargained to preserve ASTG's

competitive role. *Id.* ("his lawyers were very clever, and they ensured that he

retained full control over his company"); *see also* ER-194, ¶ 171. The single entity

rule simply has no application to the instant dispute.

Paragraph 151 alleged, with *Iqbal* sufficiency, that *in the course* of an equity

purchase—and, for that matter, a transaction transferring a majority equity

interest—Tzell *agreed* to leave managerial interests wholly vested in Odaka, an

independent economic actor. *See also* ER-181–83 ¶¶ 82–101 (alleging ASTG's

continuing competitive conduct); ER-145 lns. 18–24 (explaining ASTG's

economic motivation). Drawing, under *Iqbal*, all inferences in favor of the

pleader, the SAC reasonably implies that Tzell and ASTG had affirmatively agreed

that the money and/or value exchanging hands as part of Tzell's purchase of a

"majority equity stake" in ASTG was *insufficient* to protect even a *veto* power by

Tzell over ASTG's sale of access to Tzell's common-carrier contracts. ER-194,

¶ 171. The district court simply could not supplant the alleged *agreement* between

39

Tzell and ASTG that economic unity would *not* be a component of Tzell's equity purchase.

Endorsing the district court's reasoning would: (1) open the door to sham transactions; and (2) would improperly impact, across the board, free-market pricing for managerial/governance interests.  If competitors that have effectuated an equity transfer are entitled to claim single-entity status despite affirmatively contracting to preserve *independent* and pre-existing rights of control, then competitors would likely seize on the opportunity to engage in naked price-fixing, and other anticompetitive activity, through selling each other "majority equity stakes" while reserving to each other plenary management and governance.

Relatedly, endorsing the district court's reasoning would preclude transacting parties from separately and independently pricing rights of management and governance during the sale of a going concern.  The district court's reasoning improperly *bundles* equity interests and managerial interests and undercuts the market's ability to *independently* price the sale of those interests.  If the purchase of a majority equity interest acquires antitrust immunities in equivalent manner as the purchase of a majority managerial interest, there is reduced ability to independently price or sell rights of governance.

Indeed, if it were presumed that Odaka had agreed to deem the equity transaction's *price* as adequate due to his belief that "his lawyers were very clever,

40

and they ensured that he retained full control over his company," then the district court was affirmatively *picking Odaka's* pocket by deciding that, his very-clever-lawyers be damned, Tzell (or its even-cleverer lawyers) *had* retained the right to coerce the very control Odaka had explicitly refused to alienate.

Furthermore, if Tzell's interest in obtaining rights in ASTG had been motivated by Tzell's interest in pooling resources, reducing overhead costs, or otherwise acting as a combined entity, then such motivations would have necessarily counselled for the acquisition of corporate control. Tzell's alleged failure to obtain corporate control undercuts any suggestion that the relevant equity transaction sought created a unitary center of economic decisionmaking.

### B. The District Court Misread *Freeman* and Further Misconstrued the SAC

The district court dismissed the SAC based on its reading of *Freeman*:

> In Freeman, the Ninth Circuit noted that in situations involving "the ***absence*** of economic unity," some courts have found a single entity existed despite the fact the entities were independently owned where there was no evidence that the entities were or had been actual or potential competitors. *Freeman*, 322 F.3d at 1148 (emphasis added). However, here the SAC alleges substantial common ownership between Tzell and ASTG. Therefore, the SAC's allegations regarding alleged competition between Tzell and ASTG are irrelevant in determining whether Tzell and ASTG must be treated as a single entity. *See id.* Because the SAC alleges Defendant Tzell had majority ownership of ASTG, Defendants and ASTG must be treated as a single entity which could not have conspired with itself in violation of Section 1 of the Sherman Act. *Id.* ("Where there is ***substantial common ownership***, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses,

41

individual firms function as an economic unit and are generally treated as a single entity.") (Emphasis added).

ER-95–96 (emphasis in original). Such analysis was erroneous for numerous reasons. First, the district court could not dismiss due to allegations that were never alleged. Second, the district court's interpretation of *Freeman* was wholly subjective, because *Freeman* never defined the phrase "substantial common ownership." Third, *Freeman* predates *American Needle.* Even if the district court's construction of *Freeman* were correct, *American Needle* has since overruled it.

As to the first point, there were *no* allegations that Tzell and ASTG "divide[d] profits and losses" or that Tzell and ASTG were subject to any "fiduciary obligation[s]." ER-96. There was no allegation that Tzell and ASTG had entered into a partnership. FlightBlitz's allegation that "Tzell partially owned ASTG," ER-181, ¶ 78, read in conjunction with FlightBlitz's allegation that Odaka wholly and solely controlled ASTG, ER-190–91, ¶ 151, repudiates any suggestion that Tzell and ASTG regularly "divide[d] profits and losses." It would be most *unusual* for an entity regularly allocating profits and losses to vest all managerial prerogative in a minority partner.

As to the second point, *Freeman* never articulated an "and" test. See ER-109–11, pp. 14:23–16:8; ER-95–96. Tzell contended that *Freeman* formulated an "and" test, *id.*, meaning that, pursuant to Tzell's reading of *Freeman*, adopted by

the district court, entities with substantial common ownership are a single entity *even* when engaged in ongoing and antagonistic competition. But no such language appears in *Freeman*. To the extent that *Freeman* wrote that the single entity rule extends to "partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit," 322 F.3d at 1147–48 (*citing Arizona v. Maricopa Cnty. Med. Soc*., 457 U.S. 332, 356, 102 S. Ct. 2466, 2479, 73 L. Ed. 2d 48 (1982), and *Hahn v. Or. Physicians' Serv*., 868 F.2d 1022, 1029 n.5 (9th Cir.1988)),[9] such observation did *not* amount to a ruling that participants in "joint arrangements" are allowed to fix prices *outside* the joint arrangement or that such participants may combine resources in contexts where they remain engaged in aggressive and hostile competition. *See Arrington v. Burger King Worldwide, Inc*., 47 F.4th 1247, 1255 (11th Cir. 2022).

Freeman is simply not on point. Nothing in *Freeman* suggests that "economic unity" is created through an equity transfer where the "clever lawyers" specifically contract for—and the parties presumably price the transaction in line with—economic *dis*unity. If FlightBlitz established at trial that Odaka's

_____

[9] Indeed, perusing the cited authority debunks the notion that *Freeman* articulated an "and" test ignoring antagonistic competition between entities with partial shared ownership.

"lawyers . . . [had] ensured that he retained full control over his company" despite selling Tzell a majority equity stake; and that "[Odaka] did not need anyone's permission" to give FlightBlitz a 100% commission deal; and that even if Tzell's management objected, "[Odaka would] ha[ve] the final say" in the terms ASTG were to offer FlightBlitz, *nothing* in *Freeman* would remotely support the conclusion that such "shared" interests constituted "economic unity" of such magnitude as to warrant a *bright-line rule* compelling the courts to ignore all and any competition in actual fact.

*Freeman* cautioned against the fallacy of misinterpreting the "commonality of interest . . . in every cartel." *Freeman*, 322 F.3d at 1148. No circuit authority threw this case in Tzell's favor.

### C. *American Needle* is Squarely On-Point and Mandates Reversal

Next, even assuming that some language in *Freeman* supported Appellees' reading of that opinion, such reading was *necessarily* abrogated in *American Needle, Inc. v. National Football League*, 560 U.S. 183, 130 S. Ct. 2201 (2010). To the extent that Appellees contend that the Sherman Act ignores active, hostile, and antagonistic competition between entities sharing a limited degree of economic unity, *American Needle* clearly instructed otherwise:

> We generally treat agreements within a single firm as independent action on the presumption that the components of the firm will act to maximize the firm's profits. But in rare cases, that presumption does not hold. Agreements made within a firm can constitute concerted

action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action.

560 U.S. at 200, 130 S.Ct. at 2215; *see also id*. at n.7 & n.9. It is simply impossible to reconcile *American Needle* with Appellees' contended "and" test.

Rather, as instructed by *American Needle*, the various of levels of cooperation between ASTG and Tzell–TLG would not eliminate the need to scrutinize ASTG and Tzell–TLG's relationship *in travel-agent recruitment*. It was extensively alleged that ASTG and Tzell–TLG competed in travel-agent recruitment, ER-182, ¶ 93, and that Plaintiffs' switch from Tzell to ASTG was the product of such competition. ER-188, ¶ 136; ER-189, ¶ 142; *see also* ER-188–90, ¶¶ 135–41, 145–49. Such competition boosted Odaka and ASTG's bottom line at Tzell's expense. *See* ER-182–83, ¶¶ 94–95; *cf*. ER-145 lns. 18–24.

In the *market for travel-agent recruitment*, ASTG and Tzll plainly competed. Accordingly, *American Needle* plainly controls.

### D. The Eleventh Circuit Has Recently Endorsed FlightBlitz's Reading of *American Needle*

Recently, the Eleventh Circuit had occasion to opine on whether the partial *procompetitive* pooling of economic interests authorizes the cooperating actors to extend their shared interests and cooperation to those areas where the participants continue to maintain their economic disunity. *Arrington*, 47 F.4th 1247. The

45

Eleventh Circuit, unsurprisingly, endorsed FlightBlitz's reading of *American Needle*. *Arrington* is remarkably analogous and furnishes persuasive authority supporting FlightBlitz's contention that *American Needle* completely forecloses the view espoused by the district court.

In *Arrington*, Burger King and its franchisees, sharing their shared interest in maintaining a uniform, recognizable burger and brand, sought to enter a "no hire" agreement that would reduce their operating costs in competing for skilled labor. "[The district] court concluded that the [*Arrington*] complaint flunked the first element of a Section 1 Sherman claim [because] Burger King and each of its independent franchisees together constituted a single economic enterprise, so they were not capable of conspiring under the Sherman Act." *Id*. at 1253. Reversing, *Arrington* found that Burger King's franchisees' shared interest in marketing the chain's "well-known . . . Whopper hamburger and chicken fries," *id.*, at 1252, did not authorize those franchisees to enter anticompetitive agreements stifling competition between them in hiring, because the challenged "no hire" decision occurred in the market of personnel hiring and management, which was a market where each franchisee operated independently and in competition with the other franchisees. *Id.* at 1254. *Arrington* found its conclusion was entirely dictated by *American Needle*:

[I]n *American Needle*, the Supreme Court considered whether the 32 teams of the NFL and Properties engaged in concerted action within the coverage of Section 1 of the Sherman Act when they granted an exclusive license to Reebok International Ltd. to make and sell trademarked headwear for all 32 teams . . . .  The Court concluded they did . . . .

In arriving at this determination, the Court was careful to first specifically *identify the decision* of the 32 teams and Properties that it was evaluating for purposes of assessing whether they engaged in concerted action:  the decision to grant an exclusive license and decline to renew nonexclusive licenses . . . .

. . . . In conducting this analysis in *American Needle*, the Court observed that, despite their common interest in Properties and in promotion of the NFL, the 32 teams "compete[d] with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel." *Id.* at 196-97, 130 S.Ct. 2201.  And "[d]irectly relevant," they also competed against one another in the market for intellectual property, each trying to sell its own separate brand. *Id*. at 197, 130 S.Ct. 2201.

So, the Court explained, when the separate teams license their intellectual property, they are not "pursuing the common interests of the whole league" but instead, the interests of each separate team corporation. *Id*. (internal quotation marks omitted).  In that way, the teams each act to better their own economic interests and therefore represent "potential independent center[s] of decisionmaking." *Id*. (cleaned up).  But when the 32 teams came together to make a decision to license all their trademarks exclusively to one vendor, the Court concluded, they "deprive[d] the marketplace of independent centers of decisionmaking and therefore of actual or potential competition." *Id*. (cleaned up). As the Court observed, the NFL teams were still "separate, profit-maximizing entities and their interests in licensing team trademarks [we]re not necessarily aligned." *Id*. at 198, 130 S.Ct. 2201.

*Arrington*, 47 F.4th at 1254–56. *Arrington* proceeded to identify the considerations district courts should evaluate in determining whether defendant entities have preserved their "independent centers of decisionmaking" with respect to the challenged decision. Such inquiry, *Arrington* found, must, "[f]or starters" commence with scrutinizing the *contracts* between the entities alleged to have engaged in the challenged conduct. 47 F.4th at 1256. Once entities have *contractually agreed* to maintain independence with respect to certain areas of economic decision-making, then "there's just no question that [such actors] compete against each other and have separate and different economic interests." *Id*.

Although the Eleventh Circuit found that the language of Burger King's franchise *agreements* sufficiently compelled reversal, the Eleventh Circuit further held that, even absent such agreements, the relevant defendants' *conduct* further demonstrated that they had remained "independent centers of decisionmaking" in the context of the challenged decision:

> Plaintiffs alleged (or would have alleged in their proposed amended complaint) that the three franchisees that each of the named Plaintiffs worked for had differing approaches to recruitment on their websites. One "boasts" of various bonuses for managers, including "keys to a Jeep Wrangler or Chevy Camaro for one month." Another attempts to recruit by claiming it "is a wonderful company to work for. With competitive wages, outstanding employee benefits, and a vast variety of positions, all jobs here are accommodating to any schedules." Yet

48

> another chooses not to recruit on its own website but prefers to accept applications only through Burger King's website.
>
> So in the absence of the No-Hire Agreement, each independent Burger King restaurant would pursue its own economic interests and therefore potentially and fully make its own hiring decisions, including about wages, hours, and positions.

*Arrington*, 47 F.4th at 1256–57.  Appellants further note that *Arrington* is *not* predicated, in any way, on Eleventh Circuit authority.  *Arrington* wholly relied upon *American Needle* and *Copperweld* in reaching its holding.

### E.  *American Needle* **Has Overruled Prior Opinions Clearly Irreconcilable with its Mode of Reasoning**

Under this Circuit's *stare decisis* principles, extant circuit authority is displaced where "the relevant court of last resort . . . [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).  For such reason, *American Needle* requires abrogating *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir. 1993).  Alternatively, because *Arrington* and the dismissed SAC are distinguishable from *Fischer* in a key respect, it is unnecessary to reach the question of whether *American Needle* abrogates *Fischer*.

The district court in *Arrington* heavily relied on the "very similar case" of *Fischer* to determine that the Sherman Act did not limit Burger King's franchisees' rights to enter "no switching" agreements.  *Arrington v. Burger King Worldwide, Inc.*, 448 F. Supp. 3d 1322, 1332 (S.D. Fla. 2020), *rev'd and remanded*, 47 F.4th

1247 (11th Cir. 2022). The district court further *agreed* that, under *American Needle*, a "fact-specific and functional approach [was] required" to determine whether the relevant entities were capable of conspiring for purposes of the Sherman Act. *Arrington*, 448 F. Supp. 3d at 1332. The district court *Arrington*, and the reversing Eleventh Circuit panel, only diverged in applying the legal principles to the facts. Whereas the district court concluded that "the standard franchised agreement and other portions of the record" demonstrated that "Burger King's No-Hire Agreement constitute[d] an "internal 'agreement' to implement a single, unitary firm's policies, *Arrington*, 448 F. Supp. 3d at 1332, the Eleventh Circuit engaged in a blow-by-blow dissection of the Burger King franchise *agreement*, and, based on those allegations, concluded that the relevant franchisees had remained "independent centers of decisionmaking" within the context of the challenged decision.

For such reason, the district court should be reversed without any need to inquire into whether *Fischer* has been abrogated in *American Needle*. *Fischer* never addressed "very clever" "lawyers" being retained for purposes of ensuring that the franchisees could continue competing. *Fischer,* furthermore, arose on review from summary judgment. *Williams v. Nevada*, 794 F. Supp. 1026 (D. Nev. 1992). Even after discovery, the plaintiff had remained unable to controvert the material fact that "the franchisor contracts with each franchise for *exclusivity*

50

within a certain geographic area *to minimize competition between the franchises*." Williams, 794 F. Supp. at 1031. In *Arrington*, by contrast, Burger King did "'not grant [the franchisee] or imply any type of area or territory, exclusive, protected or otherwise, or protected customer base.'" *Arrington*, 47 F.4th at 1253. The allegations demonstrated that "Burger King and its franchisees compete against each other and have separate and different economic interests." *Id*. at 1256.

Here, the dismissed SAC aligns with *Arrington* rather than *Fischer.* The SAC alleges that ASTG retained "very clever" "lawyers" to preserve ASTG's ability to control its own affairs. ER-190–91, ¶ 151. The SAC is squarely supported by *American Needle*, and, to the extent that any prior circuit authority is perceived as supporting a contrary conclusion, such opinion would be clearly irreconcilable with *American Needle*'s mode of analysis. *Miller*, 335 F.3d at 900.

## F. *American Needle* and *Arrington* Requires Reversing the Dismissal of FllightBlitz's Cartwright Act Cause of Action

Even if it were assumed, *arguendo*, that *American Needle* fails to furnish intervening irreconcilable authority that can satisfy the standard articulated in *Miller*, *American Needle* would still compel reversing the district court's dismissal of FlightBlitz's Cartwright Act claims. The Cartwright Act was not at issue in *Jack Russell*. *See Jack Russell*, 407 F.3d 1027. *Freeman* noted that the Cartwright Act was *not* before that court, and *Freeman* further acknowledged that "'the Cartwright and Sherman Acts [we]re 'not coextensive.'" 322 F.3d at 1142 n.8.

There is not the slightest authority from this Circuit that would compel construing the Cartwright Act as more restrictive than *American Needle* or *Arrington*.  Indeed, one of the trial-court cases cited by the district court, *Elec. Waveform Lab, Inc. v. EK Health Servs*., 2016 WL 1622505, at *5 (C.D. Cal. Mar. 1, 2016); ER-91, relied on *American Needle* to determine the viability of a claim asserted under the Cartwright Act.  *See also* ER-140 (discussing *Darush v. Revision LP*, 2013 WL 8182502, at *4 (C.D. Cal. July 16, 2013)). California law demonstrates that California's courts would follow the approach espoused in *American Needle.  Kolling v. Dow Jones & Co*., 137 Cal. App. 3d 709, 721 (1982); *see also Chavez v. Whirlpool Corp*., 93 Cal. App. 4th 363, 372 (2001).

### G.    *American Needle* **Was Properly Asserted in the Lower Court**

FlightBlitz argued in the lower court that *American Needle* required denying Tzell and TLG's motion to dismiss.  ER-239.  FlightBlitz timely raised *American Needle* in FlightBlitz's opposition to the Appellees' Motion to Dismiss the FAC. *Id.* The district court, in its order dismissing the FAC, simply ignored *American Needle*.  ER-203–13.  *See In re Schwarzkopf*, 626 F.3d 1032, 1037 n.1 (9th Cir. 2010).  Furthermore, as explained, nothing in *Freeman* supports Appellees' misreading of that opinion, and *Freeman* has no bearing on the alleged agreement to *preserve* independent centers of economic decisionmaking.

52

Furthermore, *American Needle*'s effect as intervening authority by a court of last resort presents a pure issue of law that can be raised for the first time on appeal. *Pfingston v. Ronan Eng'g Co*., 284 F.3d 999, 1004 (9th Cir. 2002). Additionally, the factual record in the lower court was fully developed. *Id.* (describing an "or" test, and that satisfying either circumstance supports reviewing issues first raised on appeal). Relatedly, the contention that intervening Supreme Court authority has displaced circuit law is an argument best addressed to this court—although, to reiterate, it is dubious that *Freeman* is in any way inconsistent with *American Needle*. Rather, *American Needle* simply furnishes further proof that Appellees' phantom "and" test is insupportable. Additionally, *Arrington* was decided after the district court's ruling.

### H. The District Court's Bright-Line Rule is Inconsistent with the Federal Trade Commission's Ongoing Efforts to Identify a "Governance" Test that can Narrow Hart-Scott-Rodino Reporting Obligations

Further counselling against any endorsement of the lower-court decision, the Federal Trade Commission has previously indicated that bright-line rules are *unsuitable* for assessing the potential impact to competition caused by the pooling of *non-* governance interests in non-corporate entities.

Currently, the transfer of a non-governance majority interest in a non-corporate interests ("NCI") may trigger HSR reporting requirements. 16 C.F.R.

§ 801.1(b)(1)(ii). The Commission, however, has made it clear that such rule

remains tentative and subject to further revision or repeal:

> Comments 2 and 7 requested that the Commission change its test of control for unincorporated entities from an equity test to a governance test, more in line with the test of control for corporations. As the Commission noted in its discussion of the proposed amendment to the control rule, *this option was considered at length* but rejected *as too difficult to apply* to unincorporated entities because of the inherent differences in legal structure between corporations and unincorporated entities. As comment 7 noted: "By their very nature, unincorporated entities tend to be contractual in nature, and their management arrangements *reflect a broad continuum of contractual options*."
> . . . .
>
> While the Commission *agrees that a **workable** governance test for non-corporate entities would align the treatment of such entities even more closely with corporations*, the Commission continues to believe that applying a governance test to partnerships is in practice **unworkable** and is even more difficult to apply to other types of unincorporated entities, such as LLCs, which seem to have an endless range of different governance structures. Accordingly, the Commission declines to change the control rule at this time, but will continue to consider alternatives that bring the test for unincorporated entities more in line with corporations. It therefore invites continued input from interested parties on this subject.

70 Fed. Reg. 11,505. In 2020, the Commission further solicited public comment to

assist the Commission's inquiry into whether to maintain its extant regulations

pertaining to NCIs or whether to revise those regulations to create greater

conformity with corporate reporting requirements. *See* 85 Fed. Reg. 77,046–47.

Given the Commission's own view that a workable governance test would

be *preferrable* to its current "control" test, and that, were the Commission capable

of formulating a "workable" test, it *would* adopt a definition that brought "unincorporated entities more in line with corporations," it seems completely unfounded and misplaced for the judiciary to plunk down its own categorical bright-line rule exempting entities from Sherman Act scrutiny due to the ownership of a significant non-governance interest in a non-corporate entity. Given the Commission's own belief that such transfers are likely to *lack* significance as potential competitively-sensitive events, ("the Commission agrees that a workable *governance* test for non-corporate entities would align the treatment of such entities even more closely with corporations"), it is unclear why the judiciary should treat such transactions as conclusively probative on the issue of economic unity. The Commission, as stated, appears to believe that many such transactions are likely to be *irrelevant* to its efforts at scrutinizing the pooling and combination of economic forces.

Furthermore, the Commission has explained that LLCs "have an endless range of different governance structures," 70 Fed. Reg. 11,505, and that, for such reason, it was unwise to base regulatory review on bright-line treatment. Courts should not endorse pleading-stage dismissals predicated on nothing more than a non-governance equity interest held by one alleged conspirator in the other. No pleading stage *findings* are appropriate.

55

In summary, the district court's erroneous application of the single entity rule: (1) is foreclosed by *American Needle*; (2) finds no support in Cartwright Act jurisprudence; (3) would harm sellers and purchasers, through minting a seller's heretofore-unrecognized inalienable right to interfere with downstream pricing decisions, thereby foreclosing parties from utilizing pricing-freedom contracts; and (4) absurdly creates a bright-line rule over an issue the Commission has deemed a complex factual matter ("endless range of different governance structures") unsuitable for categorical pleading-stage exemption.

## III. *MONSANTO* HAS NO APPLICABILITY TO PRICING-FREEDOM CONTRACTS

The district court's order dismissing the SAC declined to consider Appellees' arguments that ASTG and Tzell were nonactionable communications regarding mutual business interests. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 765 (1984). *Compare* ER-89–96 *with* ER-203–214 (order dismissing FAC with leave to amend).

The district court's failure to consider Appellees' arguments under *Monsanto*—contentions the district court had previously agreed with in dismissing the FAC—indicates that the district court believed that the prior pleading deficiencies had been cured. The district court's order dismissing the SAC provides *no* indication that the SAC might be deficient under *Monsanto*.

56

Furthermore, FlightBlitz responded in the lower court to such all contentions in opposition to Appellees' motion to dismiss Appellants' SAC. *See* ER-141–47. FlightBlitz further noted that even if the Appellees were correct in their construction of the Sherman Act, such crimping of the Cartwright Act ran contrary to currently in-force CACI jury instructions. *See* ER-139–40.

Furthermore, the SAC alleges a pricing-freedom contract. ER-190–91, ¶¶ 151 ("'[Odaka] did not need anyone's permission' to give FlightBlitz a 100% commission deal"); *see also* ER-188–90, ¶¶ 135–41, 145–49 (alleging Tzell's discussions with Odaka regarding ASTG *and* Carlisle's efforts at luring FlightBlitz away from Tzell). Appellants note that, as explained below, applying *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), to the SAC's Causes of Action suffers the equivalent fallacy of contradicting market decisions. To be sure, the district court's dismissal of the SAC did *not* reach or address Appellees' contentions that they had engaged in the "unilateral" communications condoned by *Monsanto*. However, Tzell vigorously argued *Monsanto* in the lower court, and the district court's hesitation to apply *Monsanto* should have equally translated into a refusal to apply *Copperweld*. The SAC alleged that Tzell *bargained* to grant ASTG unfettered contractual rights to sell access to ASTG's own branch access. *Id.* ("'he did not need anyone's permission' to give FlightBlitz a 100% commission deal"); *see also* ER-188–90,

57

¶¶ 135–41, 145–49 (alleging Tzell's discussions with Odaka regarding ASTG *and* Carlisle's efforts at luring FlightBlitz away from Tzell). Holding that an upstream distributor can recapture pricing control after *bargaining* to alienate pricing control would improperly nullify patently procompetitive contracts for pricing freedom.

To hold that goods and services *previously priced* as completely alienable remain subject to upstream efforts at recapturing pricing control is to further hold that pricing-freedom contracts are unenforceable! If it were to become law in the Ninth Circuit that, even upon alleging a pricing-freedom contract, *Monsanto* or *Copperweld* immunize efforts to impose downstream price controls, then sellers would be unable to obtain value through selling freedom-of-pricing. This Court should protect a seller's right to *price* all benefits, rights, and interests that the seller is amenable to alienating.

Appellants also contend that the district court's analysis in footnote 3 at ER-94 is completely erroneous and would effectively *eliminate* vertical retail price maintenance as a potential basis for antitrust liability.

Vertical RPM *necessarily* entails some sort of *business relationship* that can be leveraged to exert pricing pressure on the counterparty. If, for instance, a computer store exclusively retailing in Dell computers called Helwett Packard and convinced them to stop discounting computers for the computer store across the

street, such facts would constitute a *horizontal* price-fixing agreement, notwithstanding the one party being a retailer and the other a manufacturer.

Vertical RPM, by definition, contemplates a shared business relationship that enables one party to exert economic pressure on the other. It is due to such relationship that *Leegin* eradicated the *per se* rule still applicable to horizontal price-fixing. However, it is beyond peradventure that vertical RPM continues to state a cause of action and must be scrutinized under the rule of reason. *Leegin Creative Leather Products, Inc. v. PSKS, Inc*., 551 U.S. 877 (2007). "No antitrust violation is more abominated than the agreement to fix prices." *Freeman*, 322 F.3d at 1144. Consequently, the SAC's allegations that "Odaka tried to obtain Tzell's permission regarding the handshake deal with FlightBlitz" were *not* contrary to "statements made by Odaka regarding his unilateral management authority and control over ASTG." ER-94. *Everything* about the SAC acknowledged that Tzell and TLG held the common-carrier-commission contracts, and that ASTG was beholden to continued access to those contracts or otherwise switching to Frosch or Ovation. *Every* vertical relationship is infused with the same dynamic. In every vertical relationship, the downstream seller must maintain access to a supplier or must find a new supplier.

Last, *Monsanto* cannot be applied to the "on–off" pricing scheme described in the SAC. *See* ER-198 ¶ 206. The allegations show that Tzell and TLG were not

in the business of "announcing" prices or pre-publishing rules, but that Tzell and TLG rather used an informal network of loyalists to create a structure for aggregating maximum IC volume while retaining their ability to raise pricing and eliminate potential upstarts. It is self-evident that such arrangements threaten anticompetitive injury. A dominant market player can *enshrine* such market power through giving resellers sufficient latitude and ability to undercut all competitors, while engaging in targeted price hikes aimed at eliminating up-and-coming resellers, non-loyalists, and mavericks.

The district court further failed to address FlightBlitz's contention that the Cartwright Act must be interpreted in a manner consistent with section 711 of the *California Civil Code*. ER-141. Even assuming *Monsanto* were applicable, the established California public policy against restraints on alienation precludes reading the Cartwright Act as authorizing a wholesaler to threaten termination due to a re-seller price-cutting a completely *alienated* product or service.

## II. THE CARTWRIGHT ACT STATUTORILY ENSHRINES A PLAINTIFF'S RIGHT TO PLEAD INTO COURT UNDER *CONLEY*

The district court failed to address FlightBlitz's contentions that the Cartwright Act creates a substantive right to maintain a cause of action *without* satisfying *Iqbal* pleading. ER-219. The Cartwright Act provides, by statute, a lowered pleading burden.

60

> In any . . . complaint for any offense named in [the Cartwright Act], it is sufficient to state the purpose or effects of the trust or combination, and that the accused is a member of, acted with, or in pursuance of it, or aided or assisted in carrying out its purposes, without giving its name or description, or how, when and where it was created.

*Cal. Bus. & Prof.*, § 16756; *see also id*., § 16757; *id*., § 17070 (a civil action is within the rule).  Under *Erie*, district courts recognize state-court pleading rules that are "bound" with substantive state policies.  *Allen v. Woodford*, 2006 WL 1748587, at *22 (E.D. Cal. June 26, 2006); *Thomas v. Hickman*, 2006 WL 2868967, at *38–41 (E.D.Cal. Oct.6, 2006).

## IV. APPELLANTS WERE ENTITLED TO FILE A THIRD AMENDED COMPLAINT AFTER THE SAC HAD BEEN DISMISSED

Last, even assuming that Plaintiffs–Appellants could not state a viable cause of action under the Sherman Act or Cartwright Act, the district court erred in denying leave to file a Third Amended Complaint alleging an Unruh Act claim.

### A.     FlightBlitz Never Sought an Advisory Opinion

The district court erred in holding that Plaintiffs–Appellants' suggestion for the Court to decline supplemental jurisdiction constituted a request for advisory opinion.  FlightBlitz never sought advisory relief.  Rather, FlightBlitz advised the Court that: (1) Appellants expressly declined to allege diversity jurisdiction over the Unruh Act claim; (2) for such reason, it was necessary to determine whether supplemental jurisdiction would be exercised; (3) Appellants thought supplemental

jurisdiction would be imprudent and improper; but (4) to the extent the Court

sought to exercise supplemental jurisdiction, Appellants sought leave to amend.

FlightBlitz acknowledges that disclaiming diversity jurisdiction mid-

litigation presents a thorny procedural question. If, for any reason, the district

court supposed that diversity jurisdiction continued to survive the attempted

transmogrification from an antitrust case to a civil rights case, the district court

should have *so held.* For the district court to characterized FlightBlitz's allegations

of supplemental jurisdiction as "advisory," while failing to even address diversity

jurisdiction, runs contrary to what this Court has characterized as advisory relief.

### B. FlightBlitz's Motion was Precipitated by *Kale* and *Shaver*

Prior to addressing the merits issues, Appellants briefly detour to explain the

genesis of their motion seeking an order declining supplemental jurisdiction.

Although not germane to the merits, the arcane procedural issues warrant some

introduction.

In the lower court, FlightBlitz explained that its motion was predicated on its

concern that a state court would conclude that the Ninth Circuit would likely

endorse the majority holding in *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361,

1366 (7th Cir. 1988). If a state court were to so hold, the same

state court would need to further determine whether the extant state-court

litigation between Tzell and FlightBlitz meet the "common-nucleus criterion" and

other factors that this Circuit considers. Media Rts. Techs., Inc. v. Microsoft Corp., 922 F.3d 1014, 1026 (9th Cir. 2019)

Some procedural history frames the issue in concrete terms rather than abstract principles. After FlightBlitz commenced the federal antitrust action, FlightBlitz further filed a *separate* Unruh Cause of Action against Tzell in the Los Angeles Superior Court. ER-15–41. Thereafter, Tzell, ASTG, and FlightBlitz entered a stipulation to join the *nondiverse* ASTG (currently, All Star Travel Holdings, LLC) to FlightBlitz's state-court Unruh Act suit against Tzell. ER-42–46. FlightBlitz amended its state-court action to *defeat* diversity jurisdiction, ER-15–41, and the Parties have been happily litigating in state-court ever since.

Due to *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1167 (1st Cir. 1991), and *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1366 (7th Cir. 1988), FlightBlitz moved in the district court to offer the district court supplemental jurisdiction over the state-court claims to the extent that the district court had any interest in maintaining such jurisdiction. ER-55–71. Under *Kale* and *Shaver*, "[w]hen a plaintiff pleads a claim in federal court, he must, to avoid the onus of claim-splitting, bring all related state claims in the same lawsuit *so* long as any suitable basis for subject matter jurisdiction exists." *Kale*, 924 F.2d at 1165. "Unless res judicata is to be robbed of its doctrinal significance, appellant had an obligation to cluster his theories of recovery in Kale I, by whatever necessary

63

jurisdictional means, or else forever hold his peace." *Id.* at 1166; *see also Shaver*, 840 F.2d at 1364 ("a plaintiff who initially sues in federal court must attempt to join all theories of relief arising under state law in a single proceeding if and when a jurisdictional basis for doing so exists").

An established exception to federal *res judicata* exempted FlightBlitz from attempting to assert diversity jurisdiction. Tzell's stipulation to join the nondiverse ASTG in the state-court action, thereby defeating diversity, estopps Tzell from later arguing that FlightBlitz was compelled to plead the diversity Tzell had broken. *Pueschel v. United States*, 369 F.3d 345, 356 (4th Cir. 2004); *see also Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 691 (9th Cir. 2019). Relatedly, no federal case has ever suggested that a litigant must *manufacture* jurisdiction where none existed.

### C. The Parties were Antagonistic Regarding Legal Rights

No advisory opinion was sought. A justiciable dispute exists when there exists: (1) "an honest and actual antagonistic assertion of rights by one [party] against another"; and (2) "'valuable legal rights . . . [would] be directly affected to a specific and substantial degree' by a decision from the court." *Ctr. for Biological Diversity v. United States Forest Serv.*, 925 F.3d 1041, 1048 (9th Cir. 2019). Here, the briefing on the issues demonstrated clear antagonism between the parties, and clearly framed that FlightBlitz was seeking to foreclose the Tzell Defendants from

64

*raising* any *res judicata* contention in the state court. If the Third Amended Complaint were filed, contending *res judicata* in the state court would have been an impossibility. Importantly, FlightBlitz *never* sought declaratory relief regarding how a state-court should determine a *res judicata* defense. *Such* opinion would be advisory. FlightBlitz sought to *file* an amended pleading to *preclude* such defense.

**D. FlightBlitz was Entitled to Disclaim Diversity Jurisdiction over the Proposed TAC**

The district court appears to have believed—albeit without citation—that FlightBlitz could not attempt amending on the basis of supplemental jurisdiction when diversity jurisdiction could have been asserted. ER-8–9.

FlightBlitz suggests that the law is to the contrary. The plaintiff is the master of her or his complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987). The pleader has discretion to decline pleading bases for subject-matter jurisdiction. *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 n.6, 106 S. Ct. 3229, 3233 (1986); *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 12 (2003); *Owen v. Stokes*, 849 F. App'x 662, 664 (9th Cir. 2021); *Sexual Minorities Uganda v. Lively*, 899 F.3d 24, 34 (1st Cir. 2018); *Bostick v. Gen. Motors, LLC*, 2020 WL 13283478, at *4 (C.D. Cal. July 22). The action had not been removed but had been instituted by FlightBlitz in the district court in the first instance. FlightBlitz was entitled to disclaim bases for jurisdiction.

**E.  Because the Action Had Not Terminated, FlightBlitz was Entitled to Move for Leave to Amend Under Rule 15(a)**

No judgment was entered in the lower court.  The district court did not order the action terminated.  Because judgment was not entered after the district court entered the SAC with prejudice, FlightBlitz could continue to seek leave to amend. *See Czeremcha v. International Association of Machinists and Aerospace Workers*, 724 F.2d 1552, 1556 (11th Cir.1984) ("the district court denied leave to amend because it viewed its earlier dismissal of the complaint as tantamount to a dismissal of the action. Because this characterization was in error, we remand"); *Geier v. Missouri Ethics Comm'n*, 715 F.3d 674, 677 (8th Cir. 2013*); Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (holding that a dismissal order does not terminate Rule 15 rights); *Worldwide Church of God, Inc. v. State of Cal*., 623 F.2d 613, 616 (9th Cir. 1980); *Breier v. N. Cal. Bowling Proprietors' Ass'n*, 316 F.2d 787, 789 (9th Cir. 1963); *Whitaker v. City of Houston*, Tex., 963 F.2d 831, 834 (5th Cir. 1992); *Mountain Home Flight Serv., Inc. v. Baxter Cty., Ark*., 758 F.3d 1038, 1046 (8th Cir. 2014); *White v. Relay Res*., 2019 WL 5623207, at *1 (W.D. Wash. Oct. 31, 2019).  Accordingly, the case should be remanded for the district court to determine whether it will exercise supplemental jurisdiction and whether leave to amend is warranted.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and remand with directions to deny the motions to dismiss.

Date: December 12, 2022        **LESCHES LAW**


                      /s/ Levi Lesches
                     *Attorneys for Appellants*
                     *FlightBlitz, Inc.; and*
                     *David Kaye f/d/b/a FlightBlitz*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using [insert name and version of word processing program] Times New Roman 14-point font.

Date: December 12, 2022  **LESCHES LAW**


_____/s/ Levi Lesches_____
*Attorneys for Appellants*
*FlightBlitz, Inc.; and*
*David Kaye f/d/b/a FlightBlitz*

68

## CERTIFICATE OF SERVICE

I hereby certify that on [insert date], I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 12, 2022          **LESCHES LAW**

_____/s/ Levi Lesches_____
*Attorneys for Appellants*
*FlightBlitz, Inc.; and*
*David Kaye f/d/b/a FlightBlitz*